## HOOVER CO. v. SESQUI-CENTENNIAL EXHIBITION ASS'N et al.

### No. 4015.

District Court, E. D. Pennsylvania.

April 8, 1931.

See also 26 F.(2d) 821.

Thomas Raeburn White, of Philadelphia, Pa., Wallace R. Lane, of Chicago, Ill., Algernon R. Clapp, of Philadelphia, Pa., and Benton Baker, of Chicago, Ill., for plaintiff.

Edwin M. Abbott, of Philadelphia, Pa., for Sesqui-Centennial Exhibition Ass'n.

George C. Klauder, of Philadelphia, Pa., for Eureka Vacuum Cleaner Co.

DICKINSON, District Judge.

We are indebted to the capable and experienced counsel who have argued this case for a very helpful analysis of its facts. This has saved us much labor, for which we wish to make acknowledgment. Except for this, the case would have that complexity which is the most confusing and disturbing characteristic which a case can have. Even with this help, we fear any opinion must have painful length.

There is in truth only one simple fact finding to be made, but the discussion which leads up to it is well-nigh endless. This is evidenced by the nearly two hundred requests for findings with which we have been threatened. Any one who without a guide delves into this record will become entangled in a maze of details, controversies over trivialities, and personal temperamental conflicts which may cause him to lose all sense of direction and any clear view of the legal and equitable rights of the parties.

A good beginning to an understanding of any legal controversy is to get the point of view of the complaining party. The plaintiff and one of the defendants are dealers in the trade in carpet or floor sweepers, known also from their mode of operation as vacuum cleaners. There was and is a sharp, unfriendly trade rivalry between them. Each was an exhibitor at the Sesqui-Centennial Exhibition, with a view to being given an award of merit which would have an advertising value in promoting the sale of the competing sweepers. As they were competitors, it is easy to understand that each exhibitor had a selfish interest, not only in securing an award of merit for its own make of sweeper, but also in the award made to its rival.

The grievances of which the plaintiff in the main complains grow out of an averred unlawful conspiracy among the defendants, which had three objectives: (1) To give to the rival company an unearned and undeserved award of merit in the form given; (2) to deprive the plaintiff of the award to which it had a right; and (3) to give the opportunity to the rival company to enter upon (as it at once did) an advertising campaign of detraction, which was conducted in bad faith, bad manners, bad taste, and bad English, all to the injury of the plaintiff.

1062

We may interpolate here a grievance of our own arising out of the advertising methods of the defendant company. We are not now passing judgment upon the justness of the complaints voiced by the plaintiff, but we do make the finding that the advertising of the defendant company, which affects this court, was conducted with bad judgment, whatever else may be said of it.

When the original bill was filed, it was met by a motion to dismiss on the ground that it disclosed no cause of action and because of this was without equity. We upheld the defendant in this motion as directed to the bill as first drafted, but gave the plaintiff leave to amend, of which leave it promptly availed itself. Of course, nothing was said or thought of respecting the rival merits of these sweepers, beyond perhaps the expression of the opinion that it was not the province of the court to pass upon this question. The defendant company, however, in deceptive and misleading advertising statements, given wide publicity, represented to prospective purchasers of sweepers that a United States court had solemnly pronounced the superiority of defendant's sweeper over that of the plaintiff. This act of the defendant has been brought into the record by supplemental bill. Such grossly unfair and improper conduct throws a flood of light upon what had preceded.

We have striven, and we think successfully, not to permit this episode to unduly influence our judgment upon the broader merits of the cause, but such conduct cannot be permitted to pass unnoticed. We shall endeavor later to assign to it its just consequences.

We come back from this diversion to the defense, which is a broad denial of the conspiracy charge and specific denial of the supporting averments of the bill.

It is impossible for any one to make any specific fact findings in this case with any satisfying assurance of being right without having first a grasp of the general fact situation out of which these facts emerge. That general fact situation was this:

One of the things the exhibition managers sought to do was to garner exhibits of the natural and industrial products of all the countries and nations of the world. The different governments of all nations were invited to send in exhibits of what they wished to have displayed. There was in this no direct commercial appeal, although of course the people of any country might derive a future benefit from what was thus exhibited.

A like invitation was extended to private exhibitors. The promise was held out that all exhibits would be fairly judged upon their merits and awards made which would be certificates of the merits of what was displayed. Here there was a direct appeal to the selfish commercial interests of exhibitors. Such awards were expected to have a great advertising value and would be coveted because of this. The management should have known, and of course did know, that an appeal to this selfish commercial instinct of exhibitors would arouse that small, mean, envious spirit of commercial and trade rivalry which is too often displayed when selfish trade interests come into conflict. This called for a high measure of circumspection in the awards made. The required degree of care was sadly missing. This lack was in large part due to the inherent defects of the system adopted.

It was announced that all awards would be made by a tribunal which bore the high sounding name of an International Jury of Awards. This carried with it the thought that an award meant that the exhibit thus distinguished had been tested and its merits commended by a jury of world experts. This was only nominally true. The title was a mere sonorous sound signifying really nothing. What was really done was to confer the honorary appointment of jurors upon a number of very estimable women and men, assigning them to judge different classes of exhibits. These jurors served without compensation and were graciously permitted, if so disposed, to bestow time and labor in the work of examination, and to make recommendations for awards, but the real awarding was meant to be done by the paid staff of the exhibition. Whenever reliance is placed upon unremunerated service, the work will usually be honestly done when it is done, but it will not always be done. When the power to do things which are of value to third persons is confided to paid servants, there are other dangers present. Any attempt to use both always has one of two results. In a jury of awards, for illustration, the unpaid jurors will look upon their duties as purely perfunctory and leave the awards to be made by the paid members, or if any of the unpaid jurors take their duties seriously and try to really function, a condition of friction is always created in which they feel they are being thwarted and suspicion and bickerings result. Any one who has had the participants in this controversy under observation during the developments of this trial would be persuaded that the present suit

had grown out of just the situation above outlined.

This is a convenient place to interpolate a few general findings and comments. Those to whom we have referred as the "paid staff" who had to do with the making of awards, for reasons which they aver to have been altogether proper, early manifested a purpose and an intention to see to it that the Eureka Company triumphed over the Hoover Company in the competition between them. Whether this was due to their judgment of the competitive merits of the two sweepers and the superiority of the Eureka cleaner, or to the unworthy motives with which they are charged, is an inquiry into which we see no need to go. We feel grateful for this escape because this record abounds in criminations and recriminations which run the gamut of accusations from intimated corruption to the flat charge of fraudulent alterations of writings and downright forgery. We are relieved from this inquiry because the award to the Eureka Company is not in issue here, and the failure to award to the Hoover Company is not a failure to give it the prize awarded to the Eureka Company, but, as will later appear, a wholly different prize. In the case really before us neither company has a standing to complain of the prize awarded to the other. This we think will be made clear. Notwithstanding this, each of these companies has struck a wrong attitude and has taken an indefensible position. The Eureka, instead of accepting the award made to it as a certificate to the merits of its own make of sweeper and getting out of this all the advertising value that it had, turned it into a battery of attack upon the Hoover sweeper and valued the award not as a commendation of the Eureka sweeper, but as a denial of merit in the Hoover sweeper. The Hoover people likewise felt a greater grievance because a prize was awarded to the Eureka than they did because it was denied to themselves. We limit ourselves to the fact finding that the "Paid Staff" succeeded in having the highest form of award made to the Eureka company, and as but one grand prize could be awarded in any one class competition for the same type of exhibit, such prize was perforce refused to all others.

A knowledge of the machinery through which awards were made is necessary to an understanding of what was done and how it was done. The awards were planned to be made in the name of a tribunal having, as we have said, the grandiloquent title of "International Jury of Awards." This jury was planned to be made up of subordinate juries. The honorary jurors, to whom we have referred, were permitted to play at judging of exhibits by acting as (1) a class jury. This jury might examine exhibits, and was the only jury expected in the first instance to do this. It, however, only made recommendations. The recommendations made by the class jury were to go to (2) a group jury. This jury was supposed to pass upon the recommendations of the class jury, and to make recommendations of its own. These in turn were to go to (3) a superior jury, which determined what awards were to be made. After the superior jury had made its awards, their findings went to (4) a committee on appeals, which might affirm or reverse the findings of the superior jury, and send a mandate to (5) the executive jury, which then made known the awards. The parties thus interested were then given the right to an appeal to (6) the same committee on appeals (4). This tribunal finally determined the awards which were to be made through the executive jury (5). We pause again here to note that if this system had been adhered to, the superior jury (3) would in the first instance have determined the awards subject to the approval of the committee on appeals (4), which awards would have been announced by the executive jury (5), and the awards have been made unless an interested party appealed to (6) the committee on appeals (4). On such appeal this tribunal finally determined what awards should be made, and it became the duty of the officials of the defendant association to formally make them. It is a reiteration, but the restatement in the form of a summary may be an aid to clarity, that the application of an exhibitor for an award did not ripen into a right until (1) the class jury had made its recommendation; (2) the group jury had made its recommendation; (3) the superior jury had made its award; (4) the committee on appeals had made its findings; and (5) the executive jury had announced the awards to be made. Even yet the award determined on was not a finality because it was subject to (6) an appeal to the same committee on appeals (4) which as an appellate court gave the final decision. A second comment to be made is upon the fact that the superior jury (3), which was primarily to make the awards, was never constituted, so that in truth this primary award was never made. Here we have our finger upon the sore spot of this controversy. Had there been a superior jury (3) and had it functioned, we would have before us the awards which were

1064

made. Neither the class jury (1) nor the group jury (2) could make an award. They could only make recommendations. Much time and much of this record is taken up with angry controversy over what recommendations were made by these juries. What they were is of no value to us except for what bearing this may have upon other features of the controversy. We are concerned, not with what recommendations, but solely with what awards were made.

This leads to another comment. In the machinery devised for the grinding out of awards the only operating part was the superior jury (3) as reviewed and revised by the committee on appeals. The superior jury alone, in the first instance, could make awards. As it made none, there were none made, and it follows that every award which was made was, judged by this system, irregularly made. We may, for our purposes however, consider not the system which was devised but the system which was followed, ignoring the system which was not followed. There was a class jury (1). What this jury did is in controversy, and we pass it by. There was likewise a group jury (2) over whose recommendations there is a like controversy, which we also ignore. There was also an executive jury (5), to which we give the same "absent treatment." There was, however, a committee on appeals (4), which functioned in this case as an appellate court (6). However it was brought about (and into this we do not go), the result was a grand prize (the highest class award) had been given to the Eureka Company, and a medal of honor (or the other less prize) to the Hoover Company. The appeal from this was dismissed. Had what was done rested here, the duty of a court would be clear and its labors light.

This brings us to the pivotal point of the present controversy. The committee on appeals, as we have already stated, had dismissed the appeal of the Hoover Company from the awards as they stood. This meant that the members of the "Paid Staff" had had their way, and the Eureka people had the opportunity to broadcast the boast that an "International Jury of Awards" had not only awarded to them the grand prize, thus certifying to the merits of their sweeper, but had made the award in competition with the Hoover sweeper, to which an inferior award had been made, thus certifying that in the judgment of world experts the Eureka cleaner was superior to the Hoover cleaner.

Up to this point none of the jurors who were serving without compensation had tak-

en any interest in what has grown into this controversy, beyond the more or less perfunctory part which such jurors usually take. They had performed their duties conscientiously and efficiently in the light of the information given them, with no knowledge of what was going on below the surface. After the committee on appeals had first passed upon these awards, the question arose in the mind of at least one of them whether a grave injustice had not been done the Hoover people. This was in part because the committee had been largely influenced by statements made to it that the same makes of sweepers had been in competition at the San Francisco Fair, and that the first prize had there been awarded to the Eureka Company, when the truth was that the Hoover sweeper was a different type of sweeper than the one exhibited at San Francisco. This juror in consequence wished the committee on appeals to be reconvened to reconsider the awards to be made. The suggestion met with the most strenuous opposition from the "Paid Staff," and was likewise discouraged by the responsible officials of the association.

Just here we must enter upon another digression. We have not made, because we see no need to make, any findings respecting the motives of those of the "Paid Staff" who advocated and worked for the award of a grand prize to the Eureka Company and opposed one to the Hoover Company. We have not even named them as they are not parties to this bill, nor have we discussed the propriety of their conduct pro or con. We do feel called upon to make findings respecting the conduct and motives of the executive officers of the association, and of Mr. James S. Rogers, the member of the committee on appeals to whom reference has been made. We have already found as a fact that these officers of the association discouraged any review of the awards as the first finding of the committee on appeals left them. Whether or not they acted with good judgment, we find that they acted upon their own independent judgments and from no unworthy motives. We absolve them from all charges, if there be any, of being parties to any unlawful conspiracy. The association was at the time winding up its affairs and its officials disbanding. If the executive officers were over anxious to be done with their responsibilities no one would impute any blame to them, for it cannot be said that the exhibition ended in any blaze of glory as its affairs were shortly afterwards placed in the hands of receivers. It was to be expected that the management would be disinclined to do anything which

would prolong their duties or upset any awards which had been made. The feeling to stand by what had been done was natural enough and proper enough. Mr. Rogers, for what he did, has been subjected to rather sharp, and as it seems to us, wholly uncalled for criticism. He beyond all question was a very capable member of the committee, and we make the unqualified finding that his motives were unselfish, disinterested, and wholly worthy. The very kind of opposition he encountered was bound to make him more determined, insistent, and persistent. If this took on to those whose purposes he was thwarting the appearance of partisanship and advocacy of the Hoover cause, we see no discredit to him in this. We find that he had no motive nor purpose in what he did other than to do what he could to have what he believed to be justice done. The question had been raised whether a finding, to which he had been a party, did not do an injustice to an exhibitor. This suggested to him the recalling of the committee. Objections were made and then abandoned as untenable in favor of others, which were found likewise untenable, with a recurrence to those which had been abandoned. If this confirmed him in his view that there should be a reconsideration of the action of the committee, there would be small wonder. The committee was reconvened. The situation was not without its difficulties. An award of a grand prize had been made to the Eureka Company. It would have been embarrassing to have recalled a prize once given even if this course had been practicable.

The giving of a like prize to the Hoover Company met with the obstacle of a provision of the rules. Incidentally slight attention was paid to these rules when the paid staff were in accord with what was proposed to be done. They were appealed to only to stop what the staff didn't want done. The rule referred to prescribes that only one grand prize should be awarded in class competitions between exhibits of the same type. There was, however, another rule which permitted of more than one grand prize being awarded when the exhibits were of different types, although in the same class. This offered a happy solution of the problem if the sweepers were found to be of different types. It was found that the rival sweepers, although both in the class of vacuum cleaners, operated upon wholly different principles, and hence were of different types, to each of which a grand prize might be awarded.

The committee of appeals, upon the re-

hearing granted on the application of the Hoover Company, came to the conclusion indicated and awarded a grand prize to the Hoover Company for its special type of sweeper. The Hoover Company acquiesced in this, thus putting itself out of competition with the Eureka Company. The situation then was the award of a grand prize to the Eureka for its sweeper and a like prize to the Hoover Company for a different type of sweeper. It is clear that neither has any standing in law or equity to complain of the award to the other. All that remained to be done was for the executive jury to announce the award to the Hoover Company and for the officials of the association to issue it in the form provided. The officers of the association, however, refused to follow this simple course or to permit the Hoover Company to receive the prize awarded, resulting in the filing of this bill. In its original form complaint was made of the award of a grand prize to the Eureka Company. We held that the Hoover Company had no status to object to the award of a prize to another exhibitor with whom the Hoover Company was not in competition. By the same token, we also hold that the Eureka Company cannot be heard to complain of an award to the Hoover Company or to any other exhibitor with whom it is not in competition. Notwithstanding this the Eureka Company has taken upon itself, perhaps felt driven to take upon itself, the whole burden of the defense. The paid staff and the officials of the association, instead of taking a neutral and impartial position, have yielded to the impulse to take sides with the Eureka Company and to oppose at every step the grant of a grand prize to the Hoover Company.

We can easily understand why the executive officials of the association were led into this attitude of opposition. One of the objections to issuing the grand prize awarded to the Hoover Company was that the affairs of the association had been wound up and that the officials, whose duty it was to issue the prizes, were officially defunct, yet as an expression of neutrality the offer was made to issue a grand prize to the Hoover Company, if the Eureka Company would consent. This offer was made before the bill was filed and was reiterated when the case was first before the court in the argument at bar. Of course, this was characterized by counsel for plaintiff as a mere gesture, as it was well known the Eureka Company would never consent. When the answer came to be filed, a reiteration of the offer was made.

The bill had averred that the association had refused to issue the prize to the Hoover Company without the consent of the Eureka Company.

We give the answer in its own words: "It is admitted that the officials of the defendant Association refused to accept the recommendation and decision of the illegally constituted Committee on Appeals and award a Grand Prize to the Hoover Company unless the defendant, Eureka Vacuum Cleaner Company gave its consent thereto, knowing that the Eureka Vacuum Cleaner Company would never recognize any such illegally made award."

The versatile counsel for the exhibition places a different construction upon this part of the answer from what an otherwise uninformed reader would place upon it. Any adequate discussion of all the questions of fact and law raised and discussed by counsel would unduly prolong this already overlong opinion. We in consequence content ourselves with a finding of fact and statement of the conclusions of law reached and are brought to the sole question of fact which this case presents and with which we began, which is whether the committee on appeals awarded a grand prize to the Hoover Company.

### Finding of Fact.

1. The committee on appeals, in accordance with the system of making awards and the practice followed by the Exhibition in the granting of prizes, duly awarded to the plaintiff, Hoover Company, a grand prize for its positive, agitator type of vacuum cleaner.

### Conclusions of Law.

1. It was the duty of the executive jury, upon the above award being made, to announce and publish the same, and of the officials of the Sesqui-Centennial Exhibition Association to make this award effective by granting and issuing to the Hoover Company, in the usual form, the grand prize so awarded.

2. It was within the powers of the committee on appeals to grant the rehearing allowed and to reconsider the conclusions before reached.

3. A court of equity has jurisdiction by mandatory process to enjoin the officials of said association to issue such grand prize so awarded to the Hoover Company.

4. The plaintiff has the right to a decree granting the second prayer of the bill of complaint.

5. The third prayer of the bill should be denied.

6. The plaintiff has the right to a decree against the defendant, the Eureka Vacuum Cleaner Company, for costs.

Perhaps a word should be said in support of conclusion 6. It is doubtless true that what the Eureka Company did it was to some extent provoked into doing by the tactics employed by the Hoover Company, and that it felt obliged to present its defense to the bill as filed. Thus far we do not hold the Eureka Company to blame nor have we permitted our judgment to be influenced by the flaming rhetoric in which this defendant has indulged, except in so far as it has misrepresented the rulings of this court. For this latter we do hold them blameworthy, as from this they should have refrained. Had this defendant contented itself with a defense to the charges in the bill aimed at it and to the prayer for an injunction against it, a decree for the payment of costs might have been escaped. It chose, however, to do what we have found was not its concern, viz., to challenge the right of the Hoover Company to a prize for a different type of exhibit with which it was not in competition. The consequence is a decree against it for costs.

A word of admonition may not be out of place. In the formal decree enforcing the findings made, we shall see to it that a clause is inserted that no advertising use be made of the rulings of this court. The Eureka Company may make such use as it pleases of the fact that it received a grand prize. The Hoover Company may do likewise, if and when it gets one. Neither is any concern of this court. Neither of these prizes has, however, been granted by this court, and they are neither less nor more because of any rulings of the courts. Any reference therefore to what the courts have done is out of place.

The very full briefs submitted by the defendants deserve more than mere mention. We could not, however, follow the arguments advanced without extending this opinion to such a length as to be a burden to any one who feels in duty bound to read it.

Such of the requests for findings of fact and conclusions of law as counsel may submit to be answered we will answer to be incorporated with this opinion.

To give definiteness of date for appellate and other purposes, no decree is now made, but the parties have leave to submit drafts of a formal decree in accordance herewith, the court retaining jurisdiction of the cause in order to enter a formal decree.